IN RE INTEREST OF MORFORD.
STATE OF NEBRASKA, APPELLEE, V.
LAURIE SUSAN MORFORD, APPELLANT.

300 N.W.2d 795

Filed January 9, 1981. No. 43059.

Phillip M. Bowen of Welsh, Sibbernsen & Bowen for appellant.

Donald L. Knowles, Douglas County Attorney, and Francis T. Belsky for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and MORAN, District Judge.

BRODKEY, J.

Laurie S. Morford (Laurie), the defendant-appellant and natural mother of Christopher Michael Morford, appeals to this court from an order entered by the Separate Juvenile Court of Douglas County on September 18, 1979, terminating the parental rights to her child, Christopher Morford, who was born on June 7, 1977. The parental rights of the alleged natural father of Christopher, referred to as John Doe, were also terminated and are not involved in this appeal. In its order entered on September 18, 1979, the court found that the allegations contained in the motion of the State of Nebraska to terminate the parental rights were, with the exception of one paragraph, true and supported by clear and convincing evidence, terminated such parental rights, and found that it was in the best interests and welfare of Christopher Morford, the minor child, that he be placed in custody of the Nebraska Children's Home Society for care, custody, and permanent planning, to include adoption. We affirm.

To aid in an understanding of the issues of this appeal, it will be helpful at this point to review some of the background and prior history of the appellant, Laurie, the mother of Christopher, who at the time of the incidents and proceedings referred to in this opinion was herself a minor. Laurie's background, as revealed in the record of this case, including a social history taken in connection with her own commitment to the Youth Development Center, Geneva,

Nebraska, on October 17, 1977, indicates that Laurie is a female Caucasian, who was born on March 31, 1962, and was the oldest of four children born to Robert and Delores Morford. It appears that Laurie's involvement with the juvenile court commenced in 1975, at the time her parents were obtaining a divorce. The social history report indicates that Laurie's mother, Delores, had difficulties controlling Laurie, and as a result thereof filed a petition in the juvenile court alleging that Laurie was an "ungovernable" child, presumably under Neb. Rev. Stat. § 43-202(4) (Cum. Supp. 1976). While the details of the proceedings are not set forth in the record, the report reveals that Laurie was thereafter placed in a foster care home, which placement continued through July of 1977. Laurie's child, Christopher Morford, was born on June 7, 1977, while she was under such foster care. On September 1, 1977, Laurie was placed with her mother, Delores, who thereafter complained that Laurie refused to do her chores while at home, and also indicated that she did not have room for Laurie in her house. In addition, Delores stated that Laurie had thrown a telephone at her, an act characterized by the State as an assault upon Mrs. Morford. In any event, Laurie was admitted to the Douglas County Youth Center on September 14, 1977, and remained there until October 17, 1977, when she was committed to the Youth Development Center at Geneva, Nebraska. At that time, Christopher Morford, the minor child, was placed in a foster care facility, where he has remained to the present time.

It appears that the next event which occurred in the chronology of this case is that on November 3, 1977, shortly after Laurie's commitment to Geneva, the county attorney of Douglas County, Nebraska, filed a petition in the Separate Juvenile Court of Douglas County under Neb. Rev. Stat. § 43-202(1) (Cum. Supp. 1976), alleging that Christopher was a child within the meaning of that section, being under

the age of 18 years, homeless or destitute, or without proper support through no fault of Laurie Susan Morford, natural mother of said child, who is presently unable to assume the care and custody of said child because of her confinement in the Youth Development Center at Geneva, Nebraska. After an adjudication hearing held on January 6, 1978, the juvenile court, on January 9, 1978, entered its order finding Christopher to be a child within the meaning of the aforesaid § 43-202(1), as it pertains to his mother, Laurie Susan Morford.

Laurie remained confined at Geneva, Nebraska, until her release in November of 1978, at which time she was placed in a licensed foster care home operated by a Mrs. Paula Hyland and her husband. Mrs. Hyland testified at the termination hearing that while the original goal of placement was to reunite Laurie with her child, Mrs. Hyland was unable to do so in her home. It also appears that during that period Laurie had limited visitational rights with Christopher at the home.

The record further reveals that at a review hearing held in the Separate Juvenile Court on March 15, 1979, the court, after providing that Laurie should have reasonable rights of visitation with Christopher as arranged by the director of the Douglas County Social Services, provided in addition as follows: "That Laurie Susan Morford, natural mother, in order to demonstrate emotional stability in her own life and the desire to maintain and care for Christopher Michael Morford, minor child, is ordered to do the following:

"1. That Laurie shall attend school on a regular basis.

"2. That Laurie shall participate in Positive Parenting classes.

"3. That Laurie shall participate in individual counseling along with her mother, Mrs. Morford." On April 18, 1979, the juvenile court entered a fur-

ther order, in effect reaffirming its order of March 15, 1979, but adding two additional conditions, to wit: (1) That Laurie was to attend group programs conducted by Jo Ann (sic) Furay, who was a counselor at the Child Saving Institute; and (2) That Laurie was to meet with Jo Ann (sic) Furay on an individual basis. The court entered additional orders on April 25, 1979, and July 23, 1979, which in effect continued the requirements contained in its previous orders.

It next appears that on August 17, 1979, the county attorney of Douglas County filed a motion in the juvenile court proceedings, above referred to, seeking to terminate the parental rights of the natural parents of Christopher Michael Morford, under Neb. Rev. Stat. § 43-209(6) (Reissue 1978), for the reason that reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination that Christopher was a child within the meaning of § 43-202(1). In support thereof, (1) the petition alleged that Laurie was ordered to attend a group program arranged by Jo Ann (sic) Furay, upon acceptance at the Child Saving Institute; and that although Laurie attended the teen parent group regularly, she was inconsistent, demanding, and uncooperative in the group and had not been responsive to suggestions given the group and failed to utilize her skills discussed in the group in her home situation. The county attorney also alleged that Laurie had taken an overdose of a drug in an attempt at suicide or suicide gesture, the latter three words being added as an amendment. The petition also alleged that Laurie had on numerous occasions left the foster home under the pretense of leaving for employment, but had instead gone to her mother's home to meet her boyfriend. (2) With reference to the requirement that Laurie attend school on a regular basis, the petition alleged that she had been expelled from school for 19 days for failure to cooperate and do the required work, as a result of which she was placed in the Douglas County

Youth Center on April 21, 1979, the length of said detention, however, not being set out in the petition, but which was apparently of very short duration. (3) With reference to the requirement that Laurie participate in positive parenting classes, the petition alleged that she did not attend those classes on May (sic) 24, 1979, May 1, 8, 15, 22, 29, 1979, June 5 and 12, 1979, and July 3, 1979. (4) The petition finally alleged that it was the recommendation of Mrs. Hyland, the foster mother of Laurie; Joan Furay, the caseworker at the Child Saving Institute; the Child Protective Services worker; the foster care caseworker; the guardian ad litem; and the juvenile court service officer that Laurie's parental rights be terminated. The motion for termination of parental rights came on for hearing in the juvenile court on September 18, 1979, and on that date the court entered its order terminating such parental rights, as previously referred to, and finding, with the exception of the last allegation in the petition with reference to the recommendations for the termination by the various persons named therein, that the other facts alleged as grounds for termination were generally true and supported by clear and convincing evidence.

Before discussing the evidence in the record as adduced by witnesses at the termination hearing, and also with reference to the background of the mother, Laurie, at the time of her commitment to Geneva, we first discuss the pertinent statutory provisions applicable to this appeal and also certain principles of law which are now well established in this jurisdiction. We have previously in this opinion referred to § 43-202, which sets out the jurisdiction of the juvenile court. Subsection (1) of that statute provides that the juvenile court in each county shall have exclusive original jurisdiction as to any child under the age of 18 years, who is homeless or destitute, or without proper support through no fault of his parent, guardian, or custodian. The section of the juvenile court act

dealing with the termination of parental rights is § 43-209. The part of that statute specifically applicable to this appeal reads as follows: "The court may terminate all parental rights between the parents or the mother of a child born out of wedlock and such child when the court finds such action to be in the best interests of the child and it appears by the evidence that one or more of the following conditions exist: . . . (6) Following upon a determination that the child is one as described in subdivision (1) or (2) of section 43-202, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination." We have held that parental rights may be terminated for any one of the six independent circumstances referred to in the above statute authorizing termination of parental rights. *State v. Burger*, 205 Neb. 340, 288 N.W.2d 22 (1980).

We have also held, with reference to the scope of review in this court, that as a general rule an appeal of a juvenile case is heard by trial de novo upon the record; and also that findings of fact by the trial court will be accorded great weight because the trial court heard and observed the parties and witnesses, and those findings will not be set aside on appeal unless they are against the weight of the evidence or there is a clear abuse of discretion. See, *State v. Duran*, 204 Neb. 546, 283 N.W.2d 382 (1979); *State v. Logan*, 204 Neb. 204, 281 N.W.2d 753 (1979). We have also stated that an order of the juvenile court terminating parental rights under § 43-209 must be supported by clear and convincing evidence. *In re Interest of Hill*, *ante* p. 234, 298 N.W.2d 143 (1980); *State v. Hamilton*, 204 Neb. 537, 283 N.W.2d 66 (1979); *State v. Souza-Spittler*, 204 Neb. 503, 283 N.W.2d 48 (1979).

With the foregoing statutes and rules in mind, we now examine the evidence contained in the record to determine whether there has been an improvement in Laurie's condition since her confinement to Geneva in 1977, and since her release from that institution;

and also to determine the extent and effect of her compliance or noncompliance with the orders of the court, particularly with reference to the best interests of the minor child, Christopher. The rule is well established that in a proceeding in juvenile court under § 43-209, the court may terminate all parental rights of parents when the court finds such action to be in the best interests of the child or children. See *State v. Wedige*, 205 Neb. 687, 289 N.W.2d 538 (1980). While we concede that the evidence presented in the hearing for commitment of Laurie to Geneva in 1977 would not, in itself, be sufficient for the termination of such rights in 1979, we think it is clear that such evidence may well be considered by this court in determining whether there has been an improvement in such condition, and whether, as of the date of the termination, there were grounds existing to do so. In the report of Barbara Schuett, psychologist, dated October 4, 1977, Laurie was diagnosed as having a sociopathic personality and described as being impulsive, restless, irritable, immature, moody, hostile, and rebellious. In her conclusions in that report, the psychologist stated: "Laurie is now 15½ years of age. She has a 4-month-old baby and miscarried during this stay at the Douglas County Youth Center. She reports that the father of her second child is not the father of her living baby. Laurie's behavior pattern has not improved since the evaluation in 1975, and in fact seems to have worsened." In the psychiatric evaluation by David W. Bean, M.D., consulting psychiatrist, dated October 11, 1977, he observes: "In reference to the patient's role as a mother to her four-month-old infant, this examiner has strong reservations concerning her abilities to function in that regard. Her past behavior indicates that she is unable or unwilling to structure her own life in an appropriate manner, thus leaving this examiner significantly in doubt over the patient's abilities to act in an appropriate mother role to her infant son." Also, in the "social

history" of Laurie written by Barbara Thomas, social worker, in October of 1977, the observation is made: "Although Laurie has not put her child up for adoption, she has thus far not demonstrated either an ability or a desire to properly care for him. Shortly after her present admission to the Youth Center, Laurie again was found to be pregnant. This pregnancy terminated in a miscarriage, however. Laurie was not adverse to the idea of being pregnant again, as she felt this was a means by which she could leave the Youth Center. This again demonstrates this girl's total lack of a sense of responsibility, and manipulative tendencies."

We now consider the evidence adduced at the hearing for the termination of parental rights to determine whether or not the efforts of the court to correct conditions, as reflected by its orders of March 15, 1979, et seq., have succeeded. A review of the testimony of the witnesses convinces us that the efforts have failed to do so.

Joan Furay, the counselor at the Child Saving Institute, who worked as a counselor to Laurie for a period of 3 or 4 months testified that Laurie was uncooperative with respect to her suggestions for improvement in her life at the foster home; and also in response to the question, "Do you feel that Laurie Morford still needs your type of group?" answered, "Definitely." On cross-examination she was asked:

"Q. If you have more time with Laurie, do you believe that you could be successful in obtaining some improvement in her parenting skills?

"A. I really — I don't know, because it just would depend if Laurie were willing to make some changes. But at this point up in the three or four months that I have been working with her, she had not made any changes."

Again, on redirect examination Joan Furay was asked:

"Q. Based on her past performance, do you have

any reason to believe, say, the Court was to grant you additional time to work with Laurie. Do you have any reason to believe on her past performance that she would change?

"A. No, I don't."

The next witness was Teri Beck, a state parole officer. She was asked on redirect examination:

"Q. Based on your working with Laurie Morford and her performance or lack of performance in the course of the Parole, would you at this time have an opinion as to whether Laurie Morford should have her child in her custody?

. . . .

"THE WITNESS: I believe not at this time."

Paula Hyland, the foster mother, also testified at the hearing. She was asked the following questions and made the following answers:

"Q. Did you ask that she [Laurie] be removed from your home?

"A. Yes.

"Q. Are you saying at this time that the situation between you and Laurie never improved during the whole time she was there?

. . . .

"THE WITNESS: It got increasingly worse. It had — it had started out being really quite good, I had thought, with the idea that her son could eventually come and be there as a foster child while she learned parenting and worked on this. But it just deteriorated over the eight months to the point that at that point, I felt it was hopeless for Laurie at our house."

On further cross-examination she testified as follows:

"Q. Would you say at least a portion of Laurie's problem was because there was continued frustration of her not being able to see her child but for an hour every two weeks?

"A. In my opinion, no."

Barbara Harris, service officer for the juvenile court, testified that Laurie had missed numerous

classes of the positive parenting group, and had subsequently informed her that she had obtained employment at A & W, and was unable to attend the group. Barbara Harris testified that she had talked to Laurie about it and had informed her that as far as the court was concerned, the court order would remain in effect and that she had to attend positive parenting regardless of a work schedule. She stated further that it was her opinion that Laurie's attendance at the group was more important than her seeking employment at the time. She was also asked on direct examination:

"Q. At any time during the course that she was to comply with these requirements of the Court Order, did she state to you that she just wished to give up the child?

"A. She — I did visit with Laurie when she was in Geneva. And at that time, she — we discussed Chris, when she was in Geneva, and she had informed me that she didn't have any real feelings for Chris because she hadn't been with him. And at this point, she had been talking to Joan Clemons from Nebraska Children's Home and was really unsure what to do about Chris, because she was confused that she didn't have any real motherly feelings for him."

The appellant did not call any witnesses at the termination hearing.

We feel that the court considered all the evidence presented in the case and correctly summarized valid reasons for its decision to terminate the parental rights, in its remarks announcing its decision. After finding that the allegations contained in the petition for termination were true (with one minor exception), the court stated: "Numerous attempts were made over a long period of time to stabilize Laurie in her own personal life. She was brought to Court by — on the information of her mother to the County Attorney and the status offense was filed. Thereupon, she was in, I believe, at least five different foster homes. And

during that period of time, she became pregnant and gave birth to Christopher. After Christopher's birth, he remained and resided in the home of Laurie and her mother for a time. And as the Petition before the Court now indicates, Laurie's life never did stabilize at that time sufficient for her to take charge of it in a normal and reasonable manner. . . . And I certainly can understand why the County Attorney would feel that simply because a child is young herself and gives birth to a child that that should not in itself be a reason for termination of one's parental rights. That a young person also should be given the opportunity to learn how to become a parent and raise a child, and that age itself should not be a deterrent to being a good parent. . . . However since that time, since those initial proceedings, subsequent to the filing of this Petition, there have been numerable [sic] hearings. There has been the involvement of agencies with the child; there have been the involvement of Geneva through furloughs, Laurie seeing the child when she would come home. We had review hearings in which we found she hadn't made sufficient progress while at the Youth Development Center. . . . When she finally did achieve a Parole status through the Youth Development Center into the Department of Correctional Services, we heard the testimony today that it was an off again, on again relationship with progress. That we've heard testimony from Teri Beck, her Parole Officer, from Joan Furay, from her foster parents that at no time was there any type of consistent behavior to the Court that she had attained the status of being able to take charge of her own life, and therefore the life of son Christopher. From the date this Petition was filed to today's date, her personal life has been in such disarray, she has shown such an inability to manage her own personal affairs, that in the foreseeable future, there is simply — it just doesn't appear to be a reasonable likelihood that Laurie will ever be able to give the needed support, care, and concern to enable a child to grow and

be healthy and attain an adult stature in any kind of productive and meaningful way. . . . But we really have to ask ourselves how long must we wait for Laurie to grow up? She became a parent at a young age and two years later she — Christopher has been in foster care all this time. Her position has not changed. She is still quite unable to care for him and again, how long must Christopher wait for his mother to grow up so that he could reasonably expect that he could be raised in any way sufficient to go through childhood and into an adulthood in that family? Laurie's been given opportunities, and they all haven't been easy. But it's the Court's finding that they've been sufficient, they've been fair. That there was opportunity, that opportunity was disregarded, and that when her son and the relationship between them is on the line, she chose something other than following the Order of the Court and following whatever it would take to attain — whatever it would take to obtain custody of her son and raise a son in a way that she felt would be appropriate."

Further, in announcing its decision on the motion for a new trial, the court added the following: "I just simply still believe that the child needs permanency in his life. And by leaving the matter open, that could be years, and we could be in a no man's land of Laurie doing a little bit, but not quite enough for, until Christopher is who knows how old."

We agree with the comments of the court, as set out above; and we conclude upon review in this court that the State has established by clear and convincing evidence that it was in the best interests of the child, Christopher, that the parental rights between him and his mother, Laurie, be terminated.

The appellant also assigns as error the action of the court in admitting evidence of an alleged "suicide attempt" or "suicide gesture" by the appellant. However, the record reveals that Laurie told Mrs. Hyland, her foster mother, that she had attempted to kill

herself because she was so unhappy, the reason being that her foster mother had placed restrictions on her seeing her boyfriend, and not because, as claimed by the appellant, she was frustrated by not being able to see her child more often. Whether her actions might or might not be considered a bona fide suicide attempt, the "gesture" is indicative of appellant's continuing immature behavior, and we believe the evidence was properly admitted; and appellant's claim of error in this regard is without merit.

We also wish to comment briefly on appellant's contention that § 43-209(6) is unconstitutionally vague and violated Laurie's rights to due process of law.

Counsel for Laurie admitted in oral argument to this court that he had not complied with the rules of this court as to constitutional questions and had not notified the attorney general of the presence of constitutional questions. Be that as it may, we have previously passed upon this issue in several prior opinions of this court, and the constitutionality of § 43-209 has been upheld with respect to the termination of parental rights under the above statute. See, *State v. Metteer*, 203 Neb. 515, 279 N.W.2d 374 (1979); *State v. Souza-Spittler*, 204 Neb. 503, 283 N.W.2d 48 (1979); *State v. A.H.*, 198 Neb. 444, 253 N.W.2d 283 (1977).

There being no merit to appellant's assignments of error, and no further errors appearing in the record, we determine that the order of termination of parental rights entered by the Separate Juvenile Court was correct in all respects, and must be affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissents.