IN RE INTEREST OF QUENTIN BIRD HEAD,
A MINOR CHILD UNDER THE AGE OF 18 YEARS.
STATE OF NEBRASKA, APPELLEE, V.
FREDERICK TAIL, NATURAL FATHER, APPELLANT.

308 N.W.2d 837

Filed July 31, 1981.   No. 43743.

Charles Plantz and David J. Clegg for appellant.

Dennis D. King and Terrance O. Waite of the Office of Sheridan County Attorney for appellee.

Michael T. Varn, guardian ad litem.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

Frederick (Freddie) Tail appeals from a judgment by the county court of Sheridan County, sitting as a juvenile court, which terminated his parental rights to his son, Quentin Bird Head. The parental rights of

Martha Bird Head Tail, Quentin's mother, were also terminated by this judgment; she does not appeal.

The petition to terminate parental rights was filed on June 8, 1977, at which time Quentin was approximately 1 year old. It alleged, among other things, that Quentin was a neglected and dependent child within the meaning of Neb. Rev. Stat. § 43-202(2) (Reissue 1978) because: (1) His natural parents did not make adequate provisions for his care throughout the numerous periods during which they were incarcerated for various offenses; and (2) While Quentin was in the custody of his natural parents they repeatedly jeopardized his health and well-being, both through their own use of alcohol and by leaving him in the care of intoxicated persons.

Following adjudication and disposition hearings, the county court found that Quentin was neglected and dependent under § 43-202(2) and terminated the parental rights of his natural parents on July 29, 1977. Both parents appealed to the District Court for Sheridan County, which, on December 22, 1977, upheld the finding that Quentin was neglected and dependent but vacated the termination order, saying that there was insufficient evidence introduced to support it. The matter of disposition was continued in the District Court under Neb. Rev. Stat. § 24-541 (Reissue 1979) pending hearings on the treatment of Martha Bird Head Tail, hereinafter referred to as Martha, and appellant for alcoholism and further evidence by the State. Following two additional hearings, the District Court terminated the parental rights of Martha and appellant.

Appellant contends that the District Court erred in finding: (1) The Indian Child Welfare Act did not apply to this case, hence, the State did not have to meet its procedural and substantive requirements; (2) The notice given appellant on June 10, 1977, was adequate and satisfied his right to procedural due process; and (3) There was clear and convincing evidence introduced to support the termination of appellant's parental rights. We will deal with each assignment of error separately.

The first error raised by the appellant is that the State should have complied with the substantive and procedural requirements of the Indian Child Welfare Act because Quentin is an Indian child eligible for membership in the Pine Ridge Oglala Sioux Indian Reservation. The Indian Child Welfare Act provides: "None of the provisions of this subchapter, except sections 1911(a), 1918, and 1919 of this title, shall affect a proceeding under State law for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement which was initiated or completed prior to one hundred and eighty days after November 8, 1978, but shall apply to any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child." 25 U.S.C.A. § 1923 (Supp. 1963 to 1980).

The petition to terminate the appellant's parental rights was filed on June 8, 1977, nearly 2 years prior to May 7, 1979, the effective date of the Indian Child Welfare Act. Likewise, the judgment of the District Court vacating the county court's termination order and continuing the issue of disposition, filed on January 4, 1978, predated the effective date of the Indian Child Welfare Act by more than a year. The District Court also held a disposition hearing on October 30, 1978, 6 months prior to the effective date of the act, which was continued until February 12, 1980.

Appellant argues that the dispositional hearing held on February 12, 1980, was a subsequent proceeding in the matter of termination as provided by 25 U.S.C.A. § 1923. We do not agree. The hearing of February 12, 1980, was a continuation of the one held October 30, 1978, which was itself continued from the hearing held December 22, 1977, following the appeal to the District Court. Continuations of a proceeding are not subsequent proceedings under 25 U.S.C.A. § 1923. *Matter of T. J. D.*, __Mont.__, 615 P.2d 212 (1980).

The following analysis will illustrate how this proceeding was continued from June 8, 1977, to February

12, 1980. Neb. Rev. Stat. § 43-206.03(3) and (4) (Reissue 1978) provides: "(3) At the hearing the court shall first consider only the question of whether the minor is a person described by section 43-202. This shall be known as the adjudication. After hearing the evidence on such question, the court shall make a finding and adjudication entered in the minutes based on proof . . . by a preponderance of the evidence whether or not the child is a person described by subdivision (1) or (2) of section 43-202.

"(4) If the court shall find that the child named in the petition is not within the provisions of section 43-202 it shall dismiss the case. If the court finds that the child named in the petition is such a child, it shall make and enter its finding and adjudication accordingly, designating which subdivision or subdivisions of section 43-202 such child is within; the court shall then proceed to an inquiry into the proper disposition to be made of such child. Strict rules of evidence shall not be applied at any dispositional hearing."

Under these provisions, juvenile proceedings are bifurcated into adjudication and disposition hearings. These hearings may be initiated pursuant to separate pleadings, e.g., a petition praying for adjudication which, if granted, may be followed by a motion for disposition. In such a case the juvenile court will first hear the petition for adjudication and base its findings on the allegations therein. Later, if the petition is granted, the juvenile court will hold a subsequent proceeding on the motion for disposition, basing its determination on the allegations pled in the motion. In the case now before us, however, the petition filed on June 8, 1977, prayed for both adjudication and disposition. The county court conducted an adjudication hearing on the allegations made in the petition. After finding that Quentin was a neglected and dependent child within the meaning of § 43-202(2), the county court continued its proceeding on the petition, held a disposition hearing on the allegations therein, and terminated the parent-child relation-

ship between Quentin and his natural parents.

The natural parents appealed to the District Court under § 24-541. Section 24-541 authorizes District Courts to receive additional evidence necessary for the determination of factual issues. In the instant case the District Court invoked this power, continued the disposition proceeding to February 12, 1980, and rendered a decision, dated June 16, 1980, on the original petition filed June 8, 1977.

Each of the hearings before the county and District Courts was conducted on the allegations pled in the original petition. The Indian Child Welfare Act defines a "child custody proceeding" to include "termination of parental rights" which shall mean "any action resulting in the termination of the parent-child relationship." 25 U.S.C.A. § 1903 (Supp. 1963 to 1980). Construing this definition together with the language concerning "subsequent proceedings" in 25 U.S.C.A. § 1923, we conclude that the case before us constituted a single action initiated by the June 8, 1977, petition. This action or proceeding resulted in termination of the parent-child relationship on June 16, 1980.

The second error assigned by appellant is that he was denied procedural due process because he received insufficient notice concerning the nature and purpose of the proceeding, its possible consequence, the factual basis underlying the allegations made in the petition, and the legal standard governing termination of parental rights.

The record shows that appellant was served with a summons and the petition before the commencement of this proceeding. These documents notified him as to the nature and purpose of the proceeding, its possible consequence, and the specific factual allegations on which termination might be based. He was present at the proceeding in county court and was represented by counsel at all stages of the proceeding.

Furthermore, appellant did not challenge the sufficiency of the notice he received in any manner prior to

this appeal. We have held that failure to challenge the sufficiency of either notice or the pleadings at trial where the defendant participates on the merits of the cause of action waives any defect in the notice or pleadings. *State v. Best*, 173 Neb. 483, 113 N.W.2d 650 (1962); 72 C.J.S. *Process* § 113 b. (1951).

Finally, appellant contends that the evidence presented to support the termination of his parental rights did not meet the standard of being clear and convincing. *State v. Wedige*, 205 Neb. 687, 289 N.W.2d 538 (1980); *In re Interest of Morford*, 207 Neb. 627, 300 N.W.2d 795 (1981). A summary of the evidence in the record is necessary for an analysis of this contention.

During their marriage, Martha, Quentin, and appellant had no permanent residence. Between April 1977 and April 1978 they lived for lengthy periods in Gordon, Nebraska, with Tom Plenty Wounds, Martha's uncle. Several other individuals, who are also related to Martha, resided at the Plenty Wounds home on a regular basis during the same period that Martha, Quentin, and appellant did. These individuals, Martha, and appellant were often intoxicated and frequently incarcerated for alcohol-related offenses, according to the testimony of Jim Talbot, sheriff of Sheridan County, and Ernest Justesen, a Gordon police officer. Martha testified that appellant was and remains an alcoholic.

There is evidence in the record to indicate that Tom Plenty Wounds was the major source of support for Martha, appellant, Quentin, and the other relatives who lived in the Plenty Wounds home. Tom Plenty Wounds, rather than Martha or appellant, purchased the basic items which Quentin required during the time that Quentin and his natural parents lived in the Plenty Wounds home.

Justesen testified that Quentin was left by his parents in the custody of intoxicated persons who endangered his safety more than once. Justesen related two such instances. On May 19, 1977, at about 10 p.m., Justesen arrested appellant and Martha, who were both inebri-

ated, near the Gordon city park. Later that night, Justesen located Quentin on the chest of Albert Bird Head, his uncle, who was passed out in a roadside ditch as a result of intoxication. On another occasion, appellant and Martha, who were both intoxicated, took Quentin with them to a local rendering plant where they became involved in an altercation. Gunshots were fired during the course of this conflict.

Both appellant and Martha were convicted of and incarcerated for numerous alcohol-related offenses. For example, appellant was sentenced to 60 days for assault on September 30, 1977; a fine for intoxication on December 1, 1977; 90 days for assault on January 9, 1978; and 5-7 years for assault with intent to do great bodily harm, to run consecutively with 1 year for assaulting or resisting a law enforcement officer, on March 10, 1978. Martha spent 171 days in jail between July 1976 and June 1977 for various alcohol-related offenses. During these periods until June 15, 1977, Quentin was left in the care of Martha's relatives. On that date the county court held its first hearing concerning the petition filed on June 8, 1977. Following this hearing the court ordered that Quentin be placed in a foster home pending further hearings. Quentin was placed with a foster family on September 16, 1977.

Visitations between appellant, Martha, and Quentin were first scheduled on February 18, 1978. On one occasion, Martha took Quentin to visit appellant, who was in jail. During May 1978 appellant began serving a sentence in the Nebraska penitentiary. On September 7, 1978, appellant wrote to Michael T. Varn, guardian ad litem for Quentin, from prison. Appellant inquired about Quentin's status in this letter and suggested that his oldest brother, Cleve Tail, be given custody of Quentin. Near Christmas 1979, appellant wrote to Mary York, a maintenance worker for the Sheridan County welfare office, and asked her if she would deliver a Christmas gift to Quentin from him. During January 1980 she delivered another gift, some beadwork

appellant made for Quentin.

Other than the above-mentioned visit, two letters, and the two gifts, appellant has had no contact with or concerning Quentin since January 1978.

Neb. Rev. Stat. § 43-209(4) (Reissue 1978) provides that parental rights may be terminated when "[t]he parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs . . . which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the child."

An appeal from an order terminating parental rights is heard de novo upon the record. The findings of fact by the trial court will be accorded great weight because the trial court heard and observed both the parties and witnesses. The findings of fact made by the trial court will not be set aside on appeal unless they are clearly against the weight of the evidence or there was a clear abuse of discretion. *State v. Jenkins*, 198 Neb. 311, 252 N.W.2d 280 (1977); *In re Interest of Morford*, 207 Neb. 627, 300 N.W.2d 795 (1981).

In the case now before us, the District Court found that Quentin was a neglected, dependent child because of the habit, i.e., alcoholism, of his natural parents. The evidence contained in the record was sufficient to establish clearly and convincingly that appellant was unfit by reason of habitual use of intoxicating liquor to discharge his parental responsibilities and that his failure to do so was seriously detrimental to Quentin's health and well-being. The record reveals no attempt by appellant prior to his incarceration in the Nebraska Penal and Correctional Complex to alter his habitual abuse of liquor. Given appellant's habit and the lack of evidence that he has conquered it, the best interests of Quentin were served by terminating the parental relationship.

AFFIRMED.

KRIVOSHA, C.J., concurs in result.