IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ALYSSA D. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ALYSSA D. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

DANIEL D., APPELLEE,

V.

ANGELA D., NOW KNOWN AS ANGELA C., APPELLANT.


Filed August 23, 2016.    No. A-15-1158.


Appeal from the County Court for Hall County: JOHN P. RADEMACHER, Judge. Affirmed.

Jerry Fogarty for appellant.

Mark Porto, of Shamberg, Wolf, McDermott & Depue, for appellee.


INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Angela D., now known as Angela C., appeals from the decision of the county court for Hall County, sitting as a juvenile court, terminating her parental rights to her minor children, Alyssa D., Addison D., Aidan D., and Abigail D., pursuant to Neb. Rev. Stat. § 43-292(4) (Cum. Supp. 2014). The court found that Angela is an unfit parent by reason of her habitual use of intoxicating liquor; that Angela's conduct is seriously detrimental to the children's health, morals, or well-being; and that terminating Angela's parental rights is in the children's best interests. For the following reasons, we affirm.

BACKGROUND

Alyssa, Addison, Aidan, and Abigail are the children of Angela and Daniel D., who were married in May 2000. Alyssa was born in July 2003, Addison was born in July 2006, Aidan was

- 1 -

born in September 2009, and Abigail was born in September 2010. On May 27, 2011, Daniel filed for divorce from Angela. The record does not contain the decree dissolving the parties' marriage; however, the record reflects that the marriage was dissolved and that Daniel had custody of the children.

In July 2014, following her divorce from Daniel, but before the present termination proceeding commenced, Angela gave birth to another child, Emilio C., whose father is Rogelio C. Angela married Rogelio in December 2014. Neither Emilio nor Rogelio is involved in this termination proceeding.

On December 22, 2014, in the district court for Hall County, Daniel filed a motion to terminate Angela's parental rights to their children pursuant to § 43-292(4). The motion was transferred to the juvenile court. On April 21, 2015, at the first hearing on the motion for termination of parental rights, the juvenile court advised Angela of the nature of the proceedings, the potential consequences, and her rights, as required by Neb. Rev. Stat. § 43-279.01 (Cum. Supp. 2014). The court also read verbatim the allegations contained in the motion, which alleged in detail Angela's history of alcohol abuse. In response to questioning by the court, Angela, who was represented by counsel, confirmed that she understood the allegations against her. Subsequently, Angela filed a written answer in which she denied the allegations contained in the motion.

While the termination proceedings were pending, Angela filed a total of four motions relating to visitation. Because we ultimately determine that the issue of visitation has become moot, we only briefly summarize the procedural history related to visitation. Initially, on June 18, 2015, on Angela's motion, the court granted Angela 1-hour supervised visits each Saturday and Sunday. After Angela missed two consecutive visits in violation of the terms of the visitation order, Daniel and the children's guardian ad litem began denying her visitation. Angela then filed a motion to compel visitation, and following a hearing on the motion, the court terminated visitation pending final resolution of the proceedings. In September and October, Angela filed two more motions for visitation. The court denied the visitation motions, reasoning, in part, that the hearing on Daniel's motion for termination of parental rights was less than one week away and that restarting visitation was not in the children's best interests, given that they had not had visitation with their mother for approximately three months.

The hearing on Daniel's motion for termination of parental rights commenced on October 19, 2015. Daniel called Angela as his first witness. During her testimony, Angela was shown medical records from her alcohol-related hospitalizations and treatment, as well as criminal records related to various criminal convictions. Generally, Angela acknowledged the events reflected in the records, which are briefly summarized below. Each time that Daniel's counsel offered one or more of the records into evidence, Angela's counsel objected on grounds of relevance, foundation, hearsay, and/or confrontation. We address the objections in greater detail in our analysis section below. The court overruled the objections and received all of the records into evidence.

Angela's testimony and the exhibits received into evidence revealed the following events: Angela's first alcohol-related hospitalization was on July 7, 2011, when she was admitted to the emergency room with a blood alcohol content (BAC) of .219. She was flown the same day via helicopter from a hospital in Grand Island, Nebraska, to a hospital in Lincoln, Nebraska. On August 24, Angela was admitted to the emergency room with a BAC of .309. On September 17,

she was admitted to the emergency room with a BAC of .158. Angela underwent inpatient treatment at a facility in O'Neill, Nebraska, from September 24 through October 14.

Angela was arrested on April 3, 2012, and was subsequently convicted of driving under the influence (DUI) and obstruction of a peace officer. She was placed on probation for 9 months. Angela was arrested again on May 16 and charged with driving under suspension. She was convicted and sentenced to 30 days in jail. On May 23, she was again admitted to the inpatient treatment facility in O'Neill, but she voluntarily left the facility on May 29. On June 30, she was arrested for domestic assault of her boyfriend. Pursuant to a plea agreement, Angela was convicted of disturbing the peace and was sentenced to 30 days in jail.

On July 30, 2012, Angela was admitted to the emergency room with a BAC of .147 after being found unresponsive in her home. At that time, Angela's parents obtained a temporary guardianship of her and admitted her to a treatment facility in Kearney, Nebraska, but she was discharged for unknown reasons shortly thereafter. On August 20, Angela was admitted to the emergency room with a BAC of .346, and she was brought back to the treatment facility in Kearney. On September 11, she was admitted to a different inpatient treatment facility. Angela did not successfully complete the treatment program and was administratively discharged on October 11, because her counselor believed she was focusing on external issues, her negative behaviors with staff were increasing, she was telling her peers to be dishonest with counselors to get needs met, and she was disruptive in groups. At an undisclosed time, Angela's parents dropped the temporary guardianship proceedings.

On January 1, 2013, Angela was arrested and charged with aggravated DUI, criminal impersonation, obstruction of a peace officer, refusal to submit to a blood test, refusal to submit to a preliminary breath test, and driving during suspension. Angela was convicted of DUI and criminal impersonation and sentenced to 18 months' probation. On March 4, Angela was arrested again and subsequently was convicted of driving during suspension, second offense. On August 14, Angela tested positive for alcohol and served 72 hours in jail as a probation sanction. On September 23, a probation officer observed empty cans of an alcoholic beverage in a trash can in Angela's home. The probation records received into evidence showed that Angela was then required to wear a continuous alcohol monitoring device for 90 days.

Angela was discharged from her probation in July 2014, the same month that her son Emilio was born. Angela's next alcohol-related incident occurred on November 22, when her wedding to Rogelio had to be cancelled because she was too intoxicated. The wedding later took place on December 3. On December 18, Angela was arrested for domestic assault against Rogelio. Her BAC was .223 at the time, and Emilio was present when the offense occurred.

On February 14 and 23, 2015, Angela was arrested for DUI. On March 7, Angela was admitted to the emergency room because "[she] was drunk, [she] was sick, and [she] was sad." She told medical staff, "I'm an alcoholic and I want help," but she left the hospital against medical advice. On March 9, she was again admitted to the emergency room. Her chief complaints to medical staff were, "I'm really drunk" and "I'm an alcoholic." She went from the hospital to inpatient treatment, and she successfully completed the inpatient treatment program on April 7. However, on April 20, Angela was admitted to the emergency room after having consumed ethyl alcohol, which "was essentially hand sanitizer."

In July 2015, Angela began living at the Oxford House, which is a "three-quarter house." She was asked to leave after one month because she failed a breath test. Angela also lost her job at Casey's during July. She testified that it was "a mutual thing," but she was impeached with an employee separation form, which was received into evidence and indicated that Angela's employment was terminated after she showed up for work intoxicated.

Angela testified that when the problems with her alcohol abuse began in 2011, she was employed as a licensed mental health practitioner. In September 2011, her coworkers conducted an intervention regarding her use of alcohol. In October, the Nebraska Department of Health and Human Services (DHHS) initiated disciplinary action against her regarding her alcohol abuse. The disciplinary complaint, which was received into evidence, showed that at the end of October, Angela entered into the Nebraska Licensee Assistance Program. However, in July 2012, following a relapse, a missed "random body fluid screen," an alcohol-related hospitalization, and an arrest for DUI, Angela voluntarily surrendered her license as a mental health practitioner for a minimum 2-year period.

Regarding her history of visitation with the children, Angela testified that she "never had consistent visits with the kids," except for when she was pregnant with Emilio. She agreed that her drinking was "definitely a massive factor in that," although she also testified that Daniel used her drinking "as an excuse" to limit her visitation. Angela testified that during a period of time in 2012, she had supervised visits with the children at a crisis center in Grand Island, Nebraska. Visitation records from the center were received into evidence. Angela was asked about one visit scheduled for July 28, which she called and cancelled because she was not feeling well. The cancelled visit was two days prior to one of Angela's emergency room visits for alcohol intoxication. The crisis center records reflect that the last visitation at the center was in November.

Angela testified that she had supervised visits every other weekend in September 2013. Initially, the visits were supervised by Angela's mother, but her mother stopped supervising the visits after an incident during which Angela allegedly was violent with her. Thereafter, Angela's father supervised "some" visits. It is not clear when those visits terminated.

Regarding visitation that occurred while the termination proceedings were pending, Angela testified that she was awarded weekly supervised visitation in an order dated June 18, 2015. However, Angela missed the visit scheduled for July 14 because her vehicle, which was equipped with an ignition interlock device, would not start. Angela explained that there was a problem with the ignition interlock device, which caused it to "abort." Following that missed visit, Angela had no more visits with the children prior to the termination hearing.

Angela also testified regarding an incident that occurred on October 2, 2015, during which her Alcoholics Anonymous (AA) sponsor, Sherri Perales, removed Emilio from her care. Angela explained that Rogelio had to go out of town for work and he, Angela, and Perales had reached an agreement pursuant to which Perales would remove Emilio from Angela's care if Angela was drinking. Angela admitted that she had been drinking the night before while Emilio was sleeping.

On cross-examination by her counsel, Angela testified that for a "couple months" after she moved out of the marital home in February 2012, which was approximately nine months after Daniel filed for divorce, she continued to see the children "pretty much daily." At the time, she was living with her parents in York, Nebraska, and she would drive to Grand Island to transport

the children to school or watch them while Daniel was at work. According to Angela, this daily contact ended when Angela became involved in a new relationship. Since that time, Angela had "[n]ot many" visits with the children.

Angela further testified on cross-examination by her counsel that during the parties' marriage, she had been the primary income earner and had been involved in the children's school and church activities, taken care of the children's medical needs, and ensured the children maintained relationships with friends and relatives.

On cross-examination by the children's guardian ad litem, Angela testified that she did not believe that her drinking was under control at the time of the hearing. She then explained that "no drinking is under control." She testified that she believed she was "managing [her] sobriety today" by not drinking. She also admitted that her drinking had been a "massive factor" in her inability to have consistent visitation with the children, as well as in her employment. She testified that she had five jobs in the past year.

Daniel's witnesses also included four Grand Island police officers who testified to their interactions with Angela. One officer testified that on December 18, 2014, he responded to a disturbance call at Angela's residence. Upon arrival, Angela had an odor of alcohol and was unsteady on her feet. Following an investigation, Angela was placed under arrest for second degree domestic assault, based upon visible injuries inflicted upon Rogelio. A breath test revealed that Angela's BAC was .223.

Another officer testified that on December 22, 2014, he responded to a call requesting a welfare check on Emilio. When the officer located Angela and Emilio, Angela appeared to be intoxicated, with slurred speech and unsteady balance. Angela agreed to return Emilio to Rogelio's care.

A third officer testified that on February 14, 2015, he responded to an accident scene at which witnesses indicated that a red SUV had struck two vehicles and then fled the scene. Witnesses provided a license plate number for the red SUV, which was registered to Angela. When officers located Angela at her residence, she appeared to be heavily intoxicated and had damage to her vehicle. Angela was unable to complete the standard field sobriety tests due to safety concerns. A chemical blood test revealed that Angela's BAC was .304.

A fourth officer testified that on February 23, 2015, he responded to a call made by Angela in which she reported a domestic assault. When the officer arrived, Angela told the officer that Rogelio had hit her in the face numerous times, but she had no visible injuries. She also denied being drunk but admitted to drinking the night before. Later the same day, the officer responded to a hit-and-run accident and determined that Angela had been involved. Angela was arrested for DUI with a BAC of .326.

Daniel also called Angela's mother, Jane L., as a witness. Jane testified that during Angela and Daniel's marriage, she saw their children nearly every weekend and had a good relationship with them. Following the parties' separation, Jane and her husband helped to facilitate visits between Angela and the children. According to Jane, for over a year, Angela's father would drive her from York to Grand Island every weekend to pick up the children for visits. However, Jane stopped assisting Angela with visitation after an incident on September 20, 2013, when Angela, her brother, and the children were going to go to a pumpkin patch. Angela was "getting drunker

and drunker" and ultimately "made a huge scene . . . and she whacked [her brother] across the face." The children were present during the altercation and were screaming and crying. After that, Jane and her husband stopped supervising visits "for a while."

According to Jane, during early 2014, when Angela was pregnant with Emilio, she was not drinking and she progressed to having "a couple" of unsupervised visits. However, visits ceased in November 2014 after Angela was too intoxicated to get out of the car to attend her wedding to Rogelio. Jane testified that the children were present and witnessed this incident.

Jane again agreed to supervise visits between Angela and the children in 2015. However, after the incident in July when Angela missed a visit because she could not start her car, Jane stopped the visits. Based on Angela's history, Jane suspected that Angela had been drinking.

Jane testified that she had attempted to facilitate Angela's relationship with her children for five years. When asked if her attempts had been successful, Jane said, "Absolutely not." Jane believed her attempts had not been successful "[b]ecause [Angela's] an alcoholic and she refuses to get help."

Jane indicated that Daniel had continued to allow her and her husband to have visitation with the children. Jane scheduled the visits through Daniel and his new wife, Jennifer K., whom Jane indicated acted as the children's mother and made sure that all of their needs were "met above and beyond." Jane believed that Daniel and Jennifer had been "more than willing" to facilitate a relationship between Angela and the children, and that their "only concern" had always been to keep the children safe.

Jane testified that, based on her knowledge of the parties and on her interactions with the children, she believed terminating Angela's parental rights was in the children's best interests. She explained that Angela was "a wonderful person and a wonderful mother if she's sober," but that she "cannot remain sober."

Daniel's next witness was the parties' oldest daughter, Alyssa, who was 12 years old at the time of trial. The juvenile court ultimately disregarded Alyssa's testimony, which was unfavorable to Angela, because the court was concerned that Alyssa did not fully understand "the ramifications of her testimony." We also do not discuss Alyssa's testimony in detail; however, in conducting our de novo review, we merely note that her testimony was consistent with the testimony from Daniel, Jane, and Ariel Derr (whose testimony will be detailed below).

Daniel also called Perales, Angela's AA sponsor, as a witness. Perales testified that she had been Angela's sponsor for approximately 10 or 11 months. She confirmed that in October 2015 she had entered into an agreement with Rogelio and Angela pursuant to which she would remove Emilio from Angela's care if Angela was drinking while Rogelio was out of town for work. According to Perales, on one of the days that Rogelio was out of town, she performed a breath test on Angela, revealing a BAC of .14, which led Perales to remove Emilio from Angela's care until Rogelio returned from his trip.

Perales testified that during her time as Angela's sponsor, Angela's longest period of sobriety was approximately 4½ weeks, which was when Angela was in a treatment facility for 30 days. When asked to describe Angela's progress battling alcoholism, Perales testified that it was "[l]ittle." Perales believed that Angela needed to enter a long-term residential treatment facility. She did not believe that Angela was in a position to parent her children at the time of the hearing.

Daniel's next witness was Ariel Derr, a licensed independent mental health practitioner who had served as a therapist for Alyssa and Addison since May 2012, for Aidan since February 2015, and for Abigail since July 2015. Derr testified that the children had gone through "several ups and downs in terms of visitations" with Angela, including experiencing periods of several months without seeing their mother. Derr believed this was bad for the children, because they needed consistency, stability, and reliability. Derr explained that "[e]very time their world is in upheaval, they have to adjust to that and it creates a sense of unknowns." Derr believed that the children would benefit if they no longer had the inconsistency and instability that they had experienced over the past few years.

When asked if Derr had an opinion, based on her work with the children and her training and experience, as to whether it would be in the children's best interests to terminate Angela's parental rights, Derr testified that her opinion was that "the children need consistency and stability." She further testified that based on the patterns she had observed since 2012, consistency and stability was not "something that's currently viable for them."

Upon examination by the court, Derr further testified that she had diagnosed the children as having "a chronic adjustment disorder" due to the inconsistency and instability they had experienced, which "keeps them in flux in trying to make sense of their world through their emotional and behavioral pattern[s]." When asked to give specific examples of how Angela's conduct had affected the children, Derr responded that "[s]ome basic examples would be having expectations to see or hear from somebody, a parental figure, and not being able to because they're not available." She explained that a parent's failure to meet these "basic expectations for when and how things will proceed with interactions and contacts and visits" resulted in "a lot of unknowns" for the children "in terms of expectations, dependability, safety." Derr testified that the long-term impact on the children of this inconsistency and instability would depend on each child, but generally it could "create a sense of safety concern." In addition, Derr was concerned that Alyssa had begun feeling like things were her fault and had begun "taking on some of the ownership for why things haven't worked out or why things have gone awry." Derr believed the younger children might begin to do the same "if this pattern were to continue."

Daniel testified in his own behalf, as follows. He explained that he filed for divorce in 2011 because Angela's drinking was "out of control" and was "causing a lot of pain and tears." According to Daniel, in the beginning of 2012, Angela continued to watch the children during the day and to transport them to and from school. The reason for this arrangement was to save money on daycare, since Daniel was the only one working. However, the arrangement ended in February or March, when a friend of Angela's texted Daniel to tell him that Angela was sick. When Daniel arrived home, Angela was "passed out" and "[t]here was liquor everywhere." Because of Angela's state, the children essentially had been left alone in the house. This happened on more than one occasion, such that Angela "could no longer be trusted to watch the children." At that point, Daniel began "putting safeguards in." One of the safeguards was that in April, supervised visitation between Angela and the children began taking place at the crisis center in Grand Island.

Since that time, the visitation had "a cycle to it," in which Angela would be sober for a while and have a series of visits, and "then it falls to pieces." One example of this cycle was in 2013, when Angela's parents supervised visits for a period of time, but visits were terminated in

September after Angela "[p]hysically attacked" her mother in the children's presence. Then, in 2014, Angela progressed to overnight visits with the children, but visits were terminated after Angela was too intoxicated to attend her wedding. Daniel said that before the wedding, the children had spent "an hour and a half getting dressed and getting their hair done and nails painted," and that after the wedding, Aidan, who was 5 years old, returned home and said, "Guess who was too drunk to be married?"

During the periods when the children did not have visitation with Angela, they were "more adjusted to their routine," "they function[ed] better in school," and they were "more trusting of adults." Following each incident that resulted in visitation being terminated, such as the wedding incident, the children would come home upset and disappointed. Daniel also had to terminate some phone calls between Angela and the children because Angela had slurred speech and sounded intoxicated.

Daniel described the children's relationship with Jennifer, his new wife, as "very close." Jennifer had resided with him and the children since May 2012. Jennifer coached the children's soccer teams and taught Aidan how to read and tie his shoes. Jennifer was a "[f]ifty percent partner" in child-rearing and helped by cooking dinner, transporting the children to events, reading bedtime stories, attending parent/teacher conferences, and doing "everything that a mother would do."

Daniel also testified that the children had maintained their relationship with Angela's parents. The children visited their grandparents at least once a month, and Daniel planned to continue this relationship if Angela's parental rights were terminated.

Daniel stated that based on his familiarity with his children and Angela, he believed it would be beneficial to the children to terminate Angela's parental rights. He explained that the children would only ever have a beneficial relationship with Angela if "she actually got her life in order and stayed consistent with that," but that "[s]he cannot stay consistent and that's just emotionally and physically wrenching on the children."

Daniel also said that one of the reasons he sought to terminate Angela's parental rights was because he had recently experienced a health scare, and he was concerned about what would happen to the children if he passed away. He said he would prefer to have Jennifer adopt the children than to have the children returned to Angela's care. However, the juvenile court ultimately disregarded Daniel's testimony pertaining to Jennifer's potential adoption of the children.

After Daniel rested, Angela called William Kennedy, a licensed alcohol and drug counselor, as her first witness. Kennedy testified that he began seeing Angela on January 17, 2013, and had counseling sessions with her through November of that year. At that time, he felt that Angela was making a "legitimate effort in sobriety." During the sessions, one of Angela's "major concerns" was wanting to spend more time with her children.

Kennedy stated that on December 31, 2014, at Angela's request, he completed an evaluation of Angela and referred her to "a treatment study." However, approximately 10 days later, Angela called Kennedy and indicated she had "gotten a job or something" and wanted to attend intensive outpatient treatment instead. Kennedy referred Angela to intensive outpatient treatment, but she did not attend because she had "more legal troubles." Thereafter, on February

27, 2015, Kennedy referred Angela to residential treatment. Kennedy did not know whether she attended.

Angela's next witness was Joshua Necas, who testified that he had attended between 5 and 10 AA sessions with Angela. In April 2015, Angela had offered to watch Necas' daughter, who was 6 years old at the time, while he was at work. Angela watched his daughter during the day for 2 to 3 weeks without incident, until Angela obtained a new job that did not allow her to continue the arrangement.

On cross-examination, Necas testified that he had observed Angela with Emilio but that he did not know about Angela's other children until recently when he was subpoenaed as a witness. While Necas believed Angela was "doing the right things to better herself" at the time he allowed her to watch his daughter, he probably would not have felt comfortable with Angela watching his daughter had it been "a few months later." He described one situation at an unspecified time after April 2015 when Angela called asking for a ride. When Necas arrived, Angela came out of an apartment and "couldn't really walk that well." She also had bruises on her arms and legs and a black eye. Necas had his daughter in the car, and the situation frightened her.

Mary Rock, a probation officer, was Angela's next witness. Rock supervised Angela in connection with her probation arising out of two DUI cases. Rock became Angela's probation supervisor on October 30, 2013, and Angela was successfully discharged from probation on July 14, 2014. Angela was discharged from probation early because she had completed all requirements and had "done well," with no positive drug or alcohol tests during the time that Rock supervised her. On cross-examination, Rock stated that Angela had urine tests that tested positive for alcohol on June 24 and September 23, 2013, when a different probation officer had been assigned to her case.

Angela next called Cheryl Wegner, a licensed alcohol and drug counselor at the St. Francis Alcohol and Drug Treatment Center. Wegner testified that Angela entered residential treatment at St. Francis in March 2015 after having "one or two" DUI arrests. Wegner was Angela's primary residential counselor and met with her twice a week during the 28-day program. According to Wegner, Angela did very well in treatment and was "very open and honest and focused with her need for recovery from alcoholism." During individual and group sessions, Angela discussed her "sorrow and hurt" because of her inability to see her children.

On cross-examination, Wegner stated that ordinarily after someone completes the 28-day program, they continue in "aftercare," consisting of counseling sessions two to four times a month and weekly group therapy. However, Angela did not follow through with these recommended aftercare programs.

Cheyenne Santiago testified that she worked with Angela at Walmart in 2013 and 2014. According to Santiago, Angela worked very hard and was promoted from cashier to department manager in two months. Angela watched Santiago's children in the afternoon on two occasions without incident. In addition, Santiago had observed Angela with her own children for about 2½ hours at a cookout in the summer of 2014, and had briefly met Angela's children on two other occasions. Santiago said she did not observe anything inappropriate and that there were expressions of affection between Angela and her children.

Alicia Phroper testified that she had known Angela for 3½ years after meeting her at a short-term residential treatment center in Lincoln. Phroper and Angela became close friends during the program and continued to talk on the phone daily. Phroper testified that she had been sober for 3 years and had regained custody of her own children. Angela was very good around Phroper's children, who knew Angela as "Aunt Angela." According to Phroper, Angela mentioned her children every time they spoke on the phone. Phroper believed that terminating Angela's parental rights would have a very negative effect on Angela and the children.

On cross-examination, Phroper admitted that Angela was discharged without completing the 8-week residential treatment program in Lincoln. Phroper had never observed Angela with the four children from her marriage to Daniel. She had also never met Daniel. In Phroper's opinion, Angela's parental rights should not be terminated based upon Phroper's "own personal feelings about termination," which in her opinion "doesn't help anyone's situation."

Angela also testified briefly in her own behalf in order to rebut certain testimony from Daniel's witnesses, some of which is not pertinent on appeal. She reiterated that on the day in July 2015 when she could not start her car with the ignition interlock device, it was because the device was displaying an "abort" message, not because the device detected alcohol on her breath. She explained that her father tried the device that same day and received the same "abort" message. Angela further testified that her relationship with her mother had become "[p]retty much non-existent." According to Angela, in the past her mother had expressed a fear that if she were to upset Daniel, she would no longer be able to see the children.

At the conclusion of the hearing, the court took the matter under advisement. On November 9, 2015, the court entered a written order terminating Angela's parental rights to Alyssa, Addison, Aidan, and Abigail pursuant to § 43-292(4). After recounting the evidence in detail, the court found that Daniel had proven by clear and convincing evidence that Angela was an unfit parent by reason of her habitual use of intoxicating liquor, which conduct the court found to be seriously detrimental to the health, morals, and well-being of the minor children. The court reasoned that Angela's "longstanding alcohol dependence has created serious consequences for the children due to her inability to maintain sobriety, inability to meet the mental and emotional needs of the children, and inability to maintain a healthy relationship with the children." The court noted that Angela's alcohol-related criminal convictions for DUI and domestic violence were evidence that the children would be exposed to Angela's "risky behaviors" in the future. The court also cited evidence that the inconsistency in Angela's relationship with her children over the "past few years" had been emotionally and physically wrenching on the children.

The court further found that Daniel had proven by clear and convincing evidence that termination of Angela's parental rights was in the children's best interests. The court again referenced the impact of Angela's alcohol abuse on her relationship with the children and summarized the history of Angela's inconsistent visitation with the children. The court noted the "rollercoaster of emotions" the children had experienced as Angela went "in and out of their lives," resulting in the children's diagnoses of chronic adjustment disorder. The court found that "the children's vital needs for stability, consistency and reliability cannot be met without terminating" Angela's parental rights.

Angela timely filed a notice of appeal.

## ASSIGNMENTS OF ERROR

Angela assigns, reordered, that the court erred in (1) finding that the motion for termination of her parental rights provided sufficient notice as a matter of due process, (2) receiving certain evidence over her objection, (3) finding that there was clear and convincing evidence that she was an unfit parent and that terminating her parental rights was in the children's best interests, and (4) denying her motions for visitation.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

## ANALYSIS

*Sufficiency of Notice.*

Angela assigns that the juvenile court erred in finding that Daniel's motion for termination of parental rights gave her sufficient notice as a matter of procedural due process. She points out that the children's names and ages do not appear anywhere in Daniel's termination motion and that the motion does not allege that Angela is the children's mother or that Daniel is their father. Angela claims that the motion "just confuses and leaves nothing but questions." Brief for appellant at 12.

Daniel responds that Angela never raised the issue of lack of notice before the juvenile court and therefore has waived the issue. He further argues that there was never any confusion as to which children were the subject of the motion for termination.

The Nebraska Supreme Court has held in the context of proceedings for termination of parental rights that failure to challenge the sufficiency of either notice or the pleadings at trial, where the defendant participates on the merits of the cause of action, waives any defect in the notice or pleadings. *In re Interest of Bird Head*, 209 Neb. 575, 308 N.W.2d 837 (1981). Although Daniel's motion was deficient in that it did not contain the names or ages of the parties' four minor children, and in that it did not allege that Angela and Daniel were the children's biological mother and father, Angela did not at any time challenge the sufficiency of either notice or the pleadings, and she participated on the merits of the cause of action. Therefore, Angela waived any defect in the notice or pleadings.

In her reply brief, Angela cites several termination-of-parental-rights cases in which it was held that a lack of proper notice constituted plain error, even though not complained of before the juvenile court. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014).

In *In re Interest of Tina L.K. & Billy M.*, 3 Neb. App. 483, 528 N.W.2d 357 (1995), this court held that a lack of proper notice constituted plain error where the State's petition to terminate

the mother's parental rights was brought under § 43-292(1) and (7), but the court terminated her parental rights under § 43-292(2) and (6). Similarly, in *In re Interest of D.J. et al.*, 224 Neb. 226, 397 N.W.2d 616 (1986), the Nebraska Supreme Court held that a lack of proper notice constituted plain error where the State filed a petition requesting termination of the father's parental rights to three of his children, but the juvenile court terminated the father's rights to four of his children. The court reasoned that the father had not been given any notice of an action to terminate his parental rights to the fourth child. *Id.*

We find no comparable plain error in the present case. At the first hearing on Daniel's motion for termination of Angela's parental rights, the court introduced the matter as, "In the Interest of Alyssa D[.], Addison D[.], Aidan D[.], [and] Abigail D[.]" The court then advised Angela of the nature of the proceedings, the potential consequences, and her rights, as required by § 43-279.01. The court read verbatim the allegations contained in Daniel's motion for termination of parental rights, which alleged in detail Angela's history of alcohol abuse, and which sought termination pursuant to § 43-292(4), which was the statutory section under which the court ultimately terminated Angela's parental rights. At the initial hearing, in response to questioning by the court, Angela affirmed that she understood the allegations being made against her. Furthermore, when Angela filed an answer denying the allegations of Daniel's motion for termination of parental rights, she listed all four minor children by name in the caption, identified herself as the children's natural mother, and identified Daniel as the children's natural father. Angela was represented by counsel throughout the proceedings, and she participated in the hearing on the motion for termination of parental rights, presenting testimony from a number of witnesses and confronting and cross-examining Daniel's witnesses. Considering the record as a whole, we conclude that any deficiencies in Daniel's motion for termination of Angela's parental rights did not rise to the level of plain error.

*Admission of Evidence.*

Angela also assigns that the juvenile court erred in receiving certain evidence over her objections. She argues that "the court admitted numerous reports and other materials over [her] confrontation, hearsay and foundation objections," and that "[t]he admission of such evidence was contrary to [her] due process rights." Brief for appellant at 14-15. Angela does not specifically address each challenged item of evidence in the argument section of her brief but, instead, refers us to her statement of facts, in which she indicates that the court admitted over her objection the following: hospital and treatment facility records, visitation notes, probation records, an employee separation form, and DHHS records related to the suspension of Angela's license to practice as a mental health practitioner.

Daniel responds that the juvenile court's admission of these challenged exhibits was fundamentally fair. He notes that the exhibits primarily consisted of medical records and that none of the records were prepared in anticipation of litigation. Furthermore, he notes that the process by which he obtained the records "provided additional due process protections." Brief for appellee at 18. He explains that he notified Angela of his intent to subpoena records from the various entities and that Angela objected, asserting certain privileges. After a hearing, the juvenile court ordered Daniel to have all of the subpoenaed records delivered directly to the court, so that Angela's

counsel could review the records and identify any potentially privileged material. The court was then to review the records to determine if any privilege applied before releasing the records to Daniel's counsel. Daniel also points out that at trial Angela "acknowledged each and every instance" of hospitalization and treatment reflected in the records. *Id*. at 19.

As both parties acknowledge, the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires the use of fundamentally fair procedures before a court terminates parental rights. *Id*. In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *Id*. Furthermore, the basic requirements of due process oblige a court to consider the type of evidence used in order to determine the weight to be given to that evidence. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

As we alluded to above, Angela does not offer specific argument as to why the admission of each challenged item of evidence violated her due process rights. Instead, she argues generally that the admission of the evidence "was contrary to [her] due process rights." Brief for appellant at 14-15. The only case Angela cites in support of her due process argument is *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987), in which the Nebraska Supreme Court held that it violated due process when the juvenile court received into evidence reports from the Nebraska Department of Social Services "offered to prove the truth of the matters asserted in the reports, namely, a factual basis for the conclusion that [the mother] had willfully failed to comply with the rehabilitative plan." *Id*. at 265, 417 N.W.2d at 157. The court reasoned that admitting the hearsay reports "effectively eliminated" the mother's right to cross-examination regarding the contents of the reports, which contained "prejudicial information embodied in entries by unidentified persons and which covered events outside the personal knowledge of any witness at the termination hearing." *Id*.

*In re Interest of J.S., A.C., and C.S.* is distinguishable from the present case. The challenged items of evidence in Angela's case were offered to establish her history of alcohol-related hospitalizations, inpatient treatments, arrests, employment difficulties, and license suspension. When shown the records and asked about the events reflected in the records, Angela acknowledged that the events occurred and in many cases provided additional details. Thus, this is not a situation where the records "covered events outside the personal knowledge of any witness at the termination hearing." See *In re Interest of J.S., A.C., and C.S.*, 227 Neb. at 265, 417 N.W.2d at 157.

Furthermore, as Daniel argues, the majority of the records received into evidence were medical records, which, excluding opinions and diagnoses, ordinarily would be admissible pursuant to the business records exception to the hearsay rule. See Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Reissue 2008); *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015). In addition, none of the records were "testimonial" in nature, as required to trigger the constitutional right of confrontation. See *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). These considerations support the conclusion that admission of the records did not result in fundamentally unfair proceedings.

Finally, we agree with Daniel that the process by which the juvenile court ordered the records to be subpoenaed supports the conclusion that the proceedings were fundamentally fair. As Daniel indicates in his brief, after Angela objected to his record subpoenas, the court directed that all of the subpoenaed records be delivered directly to the court, so that Angela's counsel could review the records and identify any potentially privileged material. The court was then to review the records to determine if any privilege applied before releasing the records to Daniel's counsel. This process provided further assurance as to fairness of the proceedings and as to the authenticity and trustworthiness of the records received into evidence.

*Sufficiency of Evidence for Termination.*

Angela also assigns that the juvenile court erred in finding that there was clear and convincing evidence that she was an unfit parent and that terminating her parental rights was in the minor children's best interests. She acknowledges that there was "extensive evidence of [her] alcoholism" but argues there was "little evidence that her disease was seriously detrimental to the health, morals or well being [sic] of the juveniles." Brief for appellant at 15. She maintains that "[a]lmost all of the evidence concerned incidents that occurred out of the presence of the juveniles" and that the children were in Daniel's custody "during the vast majority of the time that elapsed in this matter." *Id*. She argues: "The evidence may have indicated that the children on a few occasions were upset scared or embarrassed but this hardly rises to proof by clear and convincing evidence of a serious detriment to health, morals or well being [sic]." *Id*.

Daniel responds that the juvenile court "heard from multiple witnesses who were intimately familiar with the relationship between Angela and the children and who testified as to the harm Angela's drinking had brought them." Brief for appellee at 20-21. He argues that "the evidence was clear that Angela's years-long struggle with alcohol abuse had left the children in a state of limbo as to their relationship with her, producing a detrimental impact on the children." *Id*. at 22. He contends that "the numerous occasions in which Angela's drinking and erratic behavior caused visits to terminate were nothing short of traumatic, formative events for the children." *Id*. at 22-23.

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292, which provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000).

Before turning to the evidence, we note that this case is somewhat unusual in that it involves a proceeding for termination of parental rights initiated by a custodial parent, as opposed to one initiated by the State. In termination cases initiated by the State, where children may be placed in foster care for extended periods of time while parents deal with issues of fitness, courts have cited the children's need for permanency as a basis for concluding that termination of parental rights was in the children's best interests. See *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). But in a case initiated by a custodial parent, such as this one, permanency is not an

issue of the same magnitude, because the child will have permanency with the custodial parent, regardless of whether the non-custodial parent's rights are terminated. See *id*. Nevertheless, the permanency provided by a custodial parent does not preclude termination of the non-custodial parent's rights, if the evidence otherwise establishes the requirements for termination of parental rights by clear and convincing evidence. See *Wayne G. v. Jacqueline W.*, 21 Neb. App. 551, 842 N.W.2d 125 (2013) (affirming termination of non-custodial parent's rights in proceeding initiated by custodial parent). Thus, even though the children were in Daniel's custody during the majority of the relevant time period, this does not mean that Angela's parental rights cannot be terminated, if the evidence is otherwise sufficient.

We now turn to the issue of whether there was clear and convincing evidence establishing a statutory basis for terminating Angela's parental rights to Alyssa, Addison, Aidan, and Abigail. In its order terminating Angela's parental rights, the court found that grounds for termination existed pursuant to § 43-292(4). Grounds for termination of parental rights exist under this section if the parent is "unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile." § 43-292(4).

As stated, Angela acknowledges the "extensive evidence" of her alcoholism but challenges the juvenile court's finding that her alcoholism was seriously detrimental to the health, morals, or well-being of the juveniles. Brief for appellant at 15. In our de novo review of the record, we find that the evidence was clear and convincing that Angela chronically abused alcohol and therefore the question is whether there was clear and convincing evidence that this conduct was seriously detrimental to the children.

In *In re Interest of Keisha G.*, 21 Neb. App. 472, 840 N.W.2d 562 (2013), this court reversed an order terminating a father's parental rights after concluding that the State failed to show how a father's drug use was seriously detrimental to his daughter's health, morals, or well-being. We reasoned that most of the father's drug-related convictions occurred prior to the daughter's birth and had no detrimental effect on her. Although the father had a drug-related arrest after the daughter's birth, the record did not show that he had been convicted or sentenced for that offense. In addition, while the father had one positive drug test and had admitted to using drugs during the pendency of the termination proceedings, the State failed to adduce any evidence that his drug use had affected or been detrimental to the daughter. We found that "[t]here was no evidence that [the daughter] was present during any drug use or that any drug use affected [the father's] ability to care for [his daughter]." *Id*. at 485, 840 N.W.2d at 571. We concluded that grounds for termination under § 43-292(4) were not established. *Id*.

In *In re Interest of Keisha G.*, we relied in part on *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013), which involved a juvenile court adjudication of four children because of the mother's and stepfather's drug use and domestic violence. In that case, two of the children had been living with the mother and stepfather, but the two youngest children lived with grandparents. It was uncontested that the State met its burden as to the adjudication of the two oldest children. However, the Nebraska Supreme Court found that there was no evidence that the two younger children were present for the mother's and stepfather's drug use or domestic violence. The court held that the State failed to prove by a preponderance of the evidence an evidentiary

nexus between the neglect suffered by the older children and any definite risk of future harm to the younger children. *Id*. See, also, *In re Interest of Brianna B. & Shelby B.*, 9 Neb. App. 529, 614 N.W.2d 790 (2000) (reversing an adjudication based on parents' pattern of alcohol use where there was no evidence that children were impacted by parents' drinking).

In contrast to *In re Interest of Keisha G., supra*, and *In re Interest of Justine J. et al., supra*, the mother's drug use and neglect in *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999), was held to be sufficient for terminating her parental rights to her four children. In that case, the mother was dependent on methamphetamine and was incarcerated on six occasions during the pendency of the termination proceedings. In addition, the mother frequently was late for or absent from visitation with her children and failed to avail herself of opportunities for rehabilitation. The Nebraska Supreme Court found that the evidence established that the mother neglected the children pursuant to § 43-292(2) and was unfit as defined by § 43-292(4). *Id*. The court reasoned that the record adequately demonstrated that "even when given the chance to rehabilitate herself, [the mother] is either unwilling or unable to forgo her drug addiction." *Id*. at 614, 591 N.W.2d at 568. The court further reasoned that it was "time to end the procedural limbo" for the children, who remained in foster care during the proceedings. *Id*.

The present case is more comparable to *In re Interest of Joshua M. et al., supra*, than it is to either *In re Interest of Keisha G.*, 21 Neb. App. 472, 840 N.W.2d 562 (2013), or *In re Interest of Justine J. et al., supra*. While in the latter two cases there was no evidence that the parents' substance use had a negative impact on the children, in the present case there was such evidence. Daniel, Jane, and Derr all testified to the impact of Angela's alcoholism on the children.

Daniel testified that prior to his filing for divorce, Angela's drinking was "out of control" and was "causing a lot of pain and tears." He further explained that after the parties separated, Angela continued watching the children during the day. However, this arrangement came to an end after Daniel returned home from work to find Angela "passed out" with "liquor everywhere" and with the children essentially unsupervised. While Daniel began putting in safeguards following this incident, such as supervised visitation, this did not completely shield the children from the effects of Angela's alcoholism. Daniel described specific instances when Angela's drinking led to visitation being terminated, including the pumpkin patch incident in September 2013 and the wedding incident in November 2014. During each of these incidents, Angela was intoxicated in front of the children despite being supervised. According to Daniel, each time visitation was suspended or terminated due to Angela's conduct, the children were upset and disappointed. Daniel described the "cycle" of inconsistent visitation with Angela as "emotionally and physically wrenching on the children." According to Daniel, during the periods when the children did not have visitation with Angela, they were "more adjusted to their routine," "they function[ed] better in school," and they were "more trusting of adults."

Jane testified that she had attempted to facilitate Angela's relationship with the children for 5 years and that her attempts had "[a]bsolutely not" been successful, due to Angela's alcoholism. Like Daniel, Jane described specific incidents in which Angela's alcoholism affected the children, including in September 2013 when Angela was "getting drunker and drunker" prior to the visit to a pumpkin patch and ultimately "made a huge scene . . . [and] whacked [her brother] across the face." She said the children were screaming and crying during this incident. Later, in

November 2014, the children watched as Angela was too intoxicated to get out of the car to attend her wedding.

Derr testified that the "ups and downs" the children experienced in terms of visitation with Angela was bad for them, because "[e]very time their world is in upheaval, they have to adjust to that and it creates a sense of unknowns." Derr explained that the children needed consistency, stability, and reliability, and that they would benefit if the inconsistency and instability of the prior few years came to an end. She did not believe that consistency and stability was "currently viable for them" if the present circumstances continued. She had diagnosed the children as having "a chronic adjustment disorder" due to the inconsistency and instability they had experienced, which "keeps them in flux in trying to make sense of their world through their emotional and behavioral pattern[s]." The potential long-term impacts of this instability included "a sense of safety concern," as well as feelings of being responsible "for why things haven't worked out or why things have gone awry."

Although the juvenile court disregarded Alyssa's testimony, in conducting our de novo review, we note that Alyssa's testimony was consistent with the testimony from Daniel, Jane, and Derr. Her testimony confirmed that the inconsistent visitation with her mother had a negative emotional impact on the children.

We conclude that, based on the foregoing, Daniel established by clear and convincing evidence that Angela was an unfit parent by reason of her habitual use of alcohol, which conduct was seriously detrimental the children's health, morals, or well-being. While this case is distinguishable from *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999), in that Angela's children were in the care of their biological father during the pendency of the proceedings, rather than in foster care, this does not mean that the children were immunized from the negative effects of Angela's alcoholism. Rather, Daniel's evidence established that despite the stability that he and Jennifer provided, Angela's alcoholism was detrimental to the children, causing them repeatedly to feel that "their world is in upheaval" and resulting in their diagnoses of chronic adjustment disorder.

We now turn to the question of whether Daniel established by clear and convincing evidence that termination of Angela's parental rights was in the children's best interests. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only upon proof that a parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* While both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

While statutory grounds for termination of parental rights are based on a parent's past conduct, the best interests analysis focuses on the future well-being of the child. See *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). Thus, while we have already determined that Angela's past conduct proved that she is an unfit parent pursuant to § 43-292(4), our inquiry into the children's best interests looks ahead.

There was abundant evidence that Angela's alcoholism will continue into the foreseeable future. The pattern of drinking, followed by hospitalization or inpatient treatment, followed by relapse, which dated back to at least July 2011, was continuing unabated at the time of trial in October 2015. As recently as April 7, 2015, Angela completed an inpatient treatment program, but she relapsed on April 20 when she was admitted to the emergency room after consuming ethyl alcohol, which "was essentially hand sanitizer." Thereafter, in July, she began living at the Oxford House but was asked to leave after one month because she failed a breath test. She also lost her job at Casey's in July after showing up for work intoxicated. Only two weeks before trial, Perales had to remove Emilio from Angela's care after discovering that Angela had been drinking while left alone with her infant son. Perales testified that Angela's progress battling alcoholism had been "[l]ittle" and that Angela was not in a position to parent her children at the time of trial.

Also supporting the conclusion that Angela's struggles with alcohol are likely to continue, Jane testified that based on her knowledge of the parties and on her interactions with the children, she believed terminating Angela's parental rights was in the children's best interests, because Angela "cannot remain sober." Likewise, Derr testified that consistency and stability was not "something that's currently viable" for the children based on the circumstances at the time of trial. Derr testified that Alyssa had begun "taking on some of the ownership for why things haven't worked out or why things have gone awry," and Derr was concerned that the younger children might begin to do the same "if this pattern [of instability] were to continue."

Angela's inability to control her alcoholism was further evidenced by her repeated arrests and incarcerations. Between April 2012 and March 2015, Angela was arrested seven times and received two jail sentences of 30 days each, as well as a 72-hour jail sanction for a probation violation. At the time of the termination hearing in October 2015, Angela was awaiting sentencing in three criminal cases, consisting of two DUI cases and one domestic assault case (Angela testified that she had resolved the charges through a plea agreement and was awaiting sentencing). Officers testified to the events underlying these three recent criminal charges, all of which were alcohol-related and two of which involved hit-and-run accidents committed while Angela was intoxicated. Despite her alcohol-related criminal involvement, Angela was unable to control her alcoholism.

The foregoing evidence established that Angela has been given multiple opportunities to rehabilitate herself but has been "either unwilling or unable to forgo" her alcoholism. See *In re Interest of Joshua M. et al.*, 256 Neb. at 614, 591 N.W.2d at 568. See, also, *In re Interest of Walter W.*, 274 Neb. 859, 871, 744 N.W.2d 55, 64 (2008) ("[w]hen a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights"). While we recognize that termination of parental rights is warranted only in the absence of any reasonable alternative and as a last resort, see *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), we conclude that Daniel proved by clear and convincing evidence that termination of Angela's parental rights was in the children's best interests. Angela has been unable to control her alcoholism despite repeated hospitalizations and inpatient treatment, repeated involvement in the criminal justice system, and the possibility of termination of her parental rights. Over the past 5 years, Daniel made efforts to safeguard the children from the effects of Angela's alcoholism by, among other things, utilizing supervised

visitation, but this has not prevented Angela's conduct from being detrimental to the children. The evidence established that Angela's struggles with alcohol are likely to continue into the foreseeable future. Therefore, we affirm the juvenile court's decision to terminate Angela's parental rights to Alyssa, Addison, Aidan, and Abigail.

*Denial of Motion for Visitation.*

Angela also assigns as error that the juvenile court abused its discretion when it denied her motions for visitation with the children. However, because we have determined that the juvenile court properly terminated Angela's parental rights to her four children, we need not address the issue of whether the court abused its discretion in denying visitation during the pendency of the proceedings because the issue is now moot. See *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009) (an appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it). See, also, *Mann v. Rich*, 18 Neb. App. 849, 855-56, 794 N.W.2d 183, 189 (2011) ("Generally, we cannot afford relief to a party from a court's ruling on a temporary order because any issue relating to the temporary order is moot after it is replaced by a more permanent order.")

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the county court for Hall County, sitting as a juvenile court, terminating Angela's parental rights to her minor children, Alyssa, Addison, Aidan, and Abigail.

AFFIRMED.